Good morning Your Honors, Eric Slaviani here, Ms. Colter. I'm going to attempt to reserve three minutes for a rebuttal. We ask today that you vacate the decision of the Administrative Law Judge denying Ms. Colter a period of disability because that decision is unfrequently delivered. It is uncontested that Ms. Colter suffers from a rheumatological disorder, neurological disorder, orthopedic disorder, and later cancer, an oncology issue. In determining Ms. Colter's ability to work, the Administrative Law Judge opted to give great weight to the opinion of doctors that never treated or examined Ms. Colter and rejected the opinion of the specialist being the rheumatologist and the neurologist. I'd like to point out that if we look at 20 CFR section 404.1527C factors, those opinions have been given great weight by the ALJ. One of those doctors was an emergency room physician doctor, and another one was a family practice doctor. Neither doctor reviewed many of the medical factors, and in support of their opinion, they only offered us true sentences as to what the claimants in Maryland told us. They didn't discuss the blood disorder that she has. Although there's mention of a positive ANA, they don't talk about the pain and the fatigue that is well documented throughout the record. One of the things we learned about the orthopedic evidence, one of the things the ALJ cited was Dr. Fairfax's opinion that she was disabled due to chronic joint pain and fatigue, but then observed that the objective medical evidence, including other treatment notes, indicated that her joint diagnoses were mild, and she was responding to treatment, to injections, and that sort of thing. And then Dr. Fairfax said that he'd seen her twice before he filled out the checkbook, first to address the issue of what they're saying is mild findings. Occasionally she had synovitis, some swelling of the joints, but there was nothing more significant on examination of the hands. But she has arthritis, and she has abnormal blood work, and that can cause joint pain. It's not something that you're going to always see on X-ray or MRI just for examination. I can agree with ALJ. The opinion is that she didn't have any pain at all. It was essentially the severity of the pain, and whether that hurt the knee, the blade, or sedentary work. Correct. So the administrative law judge did note that the examination findings, which he calls as relatively benign, but she doesn't discuss the consistent report of the hand pain. The report of the decreased activities, and she actually just finds there are no hand limitations. There's no limitation. So you feel that ALJ also cited Dr. Harrell's opinion where the treatment notes reflected significant improvement in headaches and deaths over this three-year period, that the headaches were mild, and they, of course, yes, were elevated once a month, and that there were very few notations in the treatment records regarding any ancillary symptoms. I mean, isn't that the kind of specific, articulable reasons that we demand ALJ cite in its making an adverse radicality or a swing to a treating physician who would have a family-compatible position? It is, but the ALJ must consider the broader development of the record. And in this case, there's no question that those headaches exist. No one's disputing that. It's a neurological issue, and you can't look at an X-ray or an MRI and say, yes, that is what it is. She would say it is improving to the point of, well, how does that prevent her from working entirely? So, one, the period that it was one time a month, it did not remain there. She had daily, it did go to one time a month. It increased in frequency. It went back to one time a month, and then it came back to daily. So when we look at headaches, they do wax and wane. But one of the issues is the vocational expert had indicated that if Ms. Coulter couldn't simply be absent from work or have to leave work or rest or lie down during work, even three times a month, that's where it was occlusive. Nobody asked the vocational expert what would happen if that was one time a month. Would an employee put up with that? We're talking about low levels. Who got the trial counsel before that? I believe I left. So you're saying that our employer didn't ask all the right questions, as a matter of fact? No comment. All right. Thank you for pointing that out. I read the record. The other question I had for you was with regard to the adverse credibility finding, being able to point into her activities of daily living and claim that they were not consistent with the severity of the disability that she was experiencing. So let's talk about her activities of daily living. The record does show that she gets assistance from others in performing those activities. They take longer to complete, and she gets a periodical rest throughout the day. Now, that's very consistent with the opinion of the treating doctors as well. The administrative court judge never addresses the issue as to whether or not Ms. Hunter needs to rest during the day. That was really the issue at hearing. That's why it was asked if she had to rest during the day three times a month. There is nothing in the record that would persuade us of accepting that testimony. There's no conflict in the record, and there's certainly no conflict cited by the administrative law judge. What's curious is the administrative law judge found the claimant's demeanor at hearing to be unpersuasive. You said that is not an individual factor that would justify an adverse credibility finding, but it's certainly a factor that can be included in all the other factors that we've been discussing, is it not? Yes. So let's talk about what that demeanor was. It's not reflected in the transcript. The administrative court judge doesn't explain it. And what I would like to point out to the court is that demeanor is sort of a euphemism for weenie eyes and sweaty palms. Like, we just didn't like the way the witness performed in response to my questioning, and we have to give some deference to the trier of faggots sitting there watching the witness testify. So let's talk about that. Ms. Falter appeared at our hearing in March of 2012. In November of 2011, she was diagnosed with breast cancer. In January of 2012, she had bilateral mastectomy. Later that same month, she had revision surgery to her breast. In February of 2012, she had a court placement. In March of 2012, she was on chemotherapy at the time of the hearing. What could she have done? Or how did she appear that her demeanor somehow was inconsistent with any of her reported symptoms of what she was telling us? I mean, if you look at the evidence, she's coming in, she's bald, she's on chemotherapy, I mean, fatigue, pain, and the administrative court judge just says, you know, I don't like her demeanor. There's nothing on which we can measure that. We have two minutes left. Yes, thank you. Good morning. My name is Stephanie Kiley, and I represent the Acting Commissioner of Social Security at Superior Health. May it please the Court. Ms. Coulter is not disabled. During the relevant time period from early January 2010 to May 2012, she was in her early 40s, and during this time, she was able to care for herself and her grandson. At some point, she didn't require help, but at other times she testified or reported she was able to clean and care for this child until his mother came home, shower, do some housework, go grocery shopping, drive, help her son get to appointments, make dinner for the entire family. So her activities of daily living, in addition to the objective medical evidence, as well as the examination findings, support the administrative law judges, residual functional capacity determination, and Ms. Coulter was able to perform her range of labor. Ms. Evidence. What is in the record to support the LJC? There's a lot of evidence, I guess, that sharply contrasts what the funding of judges refers to. Well, Your Honor, the objective evidence, which Judge Chalmers has pointed out, does show that she has at worst moderate osteoarthritis, and that's only in one joint that's in her knee. The rest of the objective findings show mild degeneration, but also the examination findings, which are relatively normal. Well, there's a PA who does find that she has osteoarthritis in her back and pain in moving her hips and her knees, but that is the exact same finding the entire time that he treats her. In fact, it's her man. Dr. Fairfax, on two occasions that he examined her, had essentially normal findings. And Dr. Ariella, although she did see the plaintiff, Ms. Coulter, for headaches, as Judge Chalmers pointed out, the record does demonstrate that over time these headaches did wane. And I disagree with Mr. Slepian's representation that these headaches continued. The record shows as of January 2012, when Ms. Coulter was diagnosed with breast cancer, yes, she did admit to having headaches on a regular basis, but that was also due to the stress of her recent diagnosis and surgery. So how do you know that? Well, the rest of the record does not reflect after that date that there are any other complaints of headaches. Mr. Slepian submitted evidence to the Appeals Council after the administrative longitudinal decision, which is not applied to the ALJ's decision. He didn't have it before him. However, it does demonstrate that in that period of time she did not discuss headaches whatsoever. In fact, those records indicate that she had a history of migraines and that those migraines had been resolved. And I'm happy to give you those patient reports if you need those. Well, how do you consider that evidence in the record of the ALJ decision? This didn't go to the Appeals Council, did it? This evidence was submitted to the Appeals Council, which is why it's part of the administrative longitudinal decision. So you can consider it along with all the other evidence? You can consider it. However, it does not address the relevant time period. The relevant time period ends on the date of the ALJ's decision, which is March 2012. I thought you were going to provide the answer, but Mr. Slepian's statement that the headaches continue. Well, what I was explaining is that the record shows over time that there is no evidence after January 2012 during the relevant time period that has to do with her headaches. It stops at that point. So Mr. Slepian raises two arguments. The two arguments that he raises has to do with the opinion evidence of Dr. Fairfax, Dr. Arell, and the state agency physicians. And then he also raises their concern with the evaluation of Ms. Coulter's subjective testimony. So with respect to Dr. Fairfax's opinion, the ALJ found that it was entitled to this weight. And while Mr. Slepian refers to Dr. Fairfax, excuse me, as a training physician, he did not have the longitudinal relationship that our regulations contemplate when we consider someone to be a training physician. The ALJ did explain that the evidence was not, his opinions were not supported by substantial evidence. For example, the examination findings that we discussed earlier, they were especially Dr. Fairfax's, for example. So the regulations require that in order to give a physician's opinion greater weight, we consider things like the consistency with the evidence as well as the supportability. So in this case, after two examinations, it were normal findings. Dr. Fairfax basically found that this individual had, could not walk, which is not consistent with what he found, nor is it consistent with the objective findings that we've already discussed, nor is it consistent with Dr. Argyle's examination findings. While she was a neurologist, she also performed a neurological examination, which included physical activities such as gait. And this woman who does have moderate arthritis in her knee did perform well with a normal gait. There's no indication in the record that she walked in a challenging gait. There's no evidence in the record that she required assistance, that an assistant, for example, a walker or a cane, any of that evidence. Mr. Slepian also talks about the fact that there is a positive ANA one test in the record. Dr. Argyle found that his culture did not have lupus. And that was in August of 2010. But she does have an autoimmune disorder. She has alopecia, and the record supports that. The ALJ found that to be a severe impairment. Aside from the hair loss, there really wasn't a lot of evidence. There wasn't a lot of limitations besides the hair loss that are attributed to her alopecia and her autoimmune disorder. But a positive ANA could certainly address that particular impairment. Also, Dr. Fairfax found that in his opinion, that she was limited based on her chronic stroke panic fatigue, but his treatment records also don't document fatigue at all.  She's the treating neurologist who treated the claimant for her headaches, which has been established over time having improved. But Dr. Argyle, her findings were based solely on Ms. Coulter's objective statements. She says that in her opinion, that the record does not support, or that these restrictions could not be reasonably expected to result from the diagnostic findings. And this alone, as we explained in our brief, is a good reason to give less weight to Dr. Argyle's opinion. And then the ALJ did give great weight to the state agency physician opinions, Dr. Handel and Dr. Keir. What's notable about Dr. Keir's opinion is that he offered it one month before Dr. Fairfax first saw Ms. Coulter. And Dr. Keir listed all of the evidence that he evaluated in making that, in issuing that opinion, and he discussed the findings in the form, the state agency form, and then offered his proposed RFC in that situation. And the ALJ did give great weight to that opinion. Last, Mr. Veslethian challenges the credibility of Ms. Coulter, which we now refer to as her subjective statements. The ALJ found that her statements were not entirely supported by the objective evidence, and then had to move forward and consider other factors because you couldn't justify the limitations that she stated she had as a result of the subjective evidence. And so what he did is he looked at, for example, her activities of daily living, which in this case demonstrates that she is not as limited as she stated. It doesn't mean that she's not limited at all, but, for example, when she went to visit the consultative examiner in June of 2011, she reported that she was able to care for her grandson, that she was able to feed him breakfast and shower. This was found in transfer in page 638, and that she thus didn't clean the house until the process showed maybe she cleaned for her family of five. And in that report, she doesn't specifically state that all that she needed to rest or that she needed assistance. So this evidence does support the ALJ's finding that this younger individual who's in her early 40s does retain a limited residual functional capacity. So she's not unlimited in her abilities, but she does retain the ability to perform something, and does retain the ability to perform substantial daily activity in this case. The claimants, to me, are adhering, as you mentioned, is not a factor that the ALJ relied on. It's just a factor that the ALJ considered. But even if that is... I'm not sure that's quite accurate. As I read the record, it was a factor the ALJ cited, in addition to all the other points that we've been discussing with you as the basis for his determination that she was exaggerating So on transfer page 21, what the ALJ says, and this is where it discusses the demeanor while testifying, at the very top of the page, and he says, it is emphasized that this observation is only one among many being relied on in assessing credibility and is not determinative. Well, you certainly said that she relied on it, which she did, but she also stated that it was not determinative, and that's consistent with what you said. So you are overtying counsel if you want to sum up what she's doing. This culture is not disabled under the Act. She retains the ability to perform her past light and sedentary work, and in the alternative, retains the ability to perform other light work that exists and seems to benefit members of the national economy. Thank you. I'd like to point out that although the United States legislature indicated she gave great weight to those non-treating positions, they found more restrictions in the ALJ data. Her decision isn't even consistent with that. But even with those restrictions, do they still support any determination that she could do lighter sedentary work if they were sent to a state agency? Not by EPA, but sedentary. That's excluding the effects of the pain and the fatigue. What I really want to point out is that if the commissioner says that they're relying on the report of these non-treating doctors, and if you compare what they wrote, because it's four sentences of what they wrote, and what they don't talk about is that an MRI shows that there's positive deformity of the cervical root sleeves at transcript page number 602. Another MRI shows a disc restriction at C3-4, flooding the spinal canal at page number 896. Other records confirm that she has increased white blood cell counts, elevated SSA, RNP at page 661. I don't know what an SSA or an RNP is or the meaning of those, but the only doctor that's considered those is the treating rheumatologist. Now, they're complaining that the doctor had only seen the claimant twice, but the treatment at that facility was wrong. And Dr. Nelson, I believe, is the rheumatologist, I'm sorry, P.A. Nelson, is the physician assistant to Dr. Fairford. Now, if you read the statute, the D27C, all they require is a treating relationship. And if you look at cases like Bochanson, P-H-O-K-A-S-S-I-A-N, it says two visits over a 14-month period is sufficient for a treating physician relationship. And clearly, Dr. Fairfax was very involved in this. The other thing, lastly, I just want to point out, they're focusing in on her activities of daily living. I want to talk to you about where that came from. It came from the report of this psychiatrist. He writes, there's no evidence of exaggeration at page 633. Ms. Coulter was cooperative and had a cooperative demeanor and consistent reporting, page 633. She does not spend time much with friends due to medical conditions. Her barriers, reported barriers to employment are she can't stand for long periods, her hands go numb. If cleaning, she will have to sit and take a break. And that's at page 636. It says sometimes her daughter will wash her hair for her because her hands go numb. Food preparation takes longer due to medical problems. She needs help stopping because she can't stand, walk, or lift. So they take out this small portion and forget about everything else. Let's talk about her credibility. Everybody finds her credible except the administrative law judge. And we have to. Thank you. I'm just kidding on your own. You were doing fine. The case is good. Always good to see you.
judges: Tallman, Watford, Guirola